IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

BART WAYNE WOODARD                                                              PLAINTIFF

v.                                    Civil No. 6:17-CV-06113

DR. NYNETT VOWELL,[1] REGISTERED                                              DEFENDANTS
NURSE MORGAN, APN HART, LVN
ROBINSON

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed pursuant to 42 U.S.C. § 1983. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation. Currently before the Court is Defendants' Motion for Summary Judgment.[2] (ECF Nos. 21, 22, 23).

## I. BACKGROUND

Plaintiff filed his Complaint and a Motion for Preliminary Injunction and Temporary Restraining Order on October 31, 2017. (ECF Nos. 1, 6). He was directed to file an Amended Complaint due to deficiencies in his first Complaint and did so on December 26, 2017. (ECF Nos. 7, 8). His Motion for Preliminary Injunction and Restraining Order was denied on May 15, 2018. (ECF No. 18).

---

[1] Based on documents submitted by Defendants, Defendant Vowell's correct first name is Nannette.
[2] Defendants request the dismissal of Defendants Morgan and Robinson based on Plaintiff's deposition testimony that he intended to dismiss them from the case. Because Plaintiff never actually filed a motion to dismiss these parties, the Court will not address this request and will simply address the Motion for Summary Judgment on the merits for all parties.

1

In his Amended Complaint, Plaintiff alleges several violations of his constitutional rights based on the medical treatment provided for his hip.[3] (ECF No. 8). Plaintiff alleges that upon his intake into the Arkansas Department of Correction ("ADC") on October 1, 2015, Defendant Hart threw away the medication he had been taking at "WCSO"[4] and refused his request for an ambulation assisting device. (*Id*. at 4). Plaintiff alleges this caused damage to his pelvis and femur head, causing him acute pain. (*Id*.) He alleges Defendant Vowell told him he would not get a device until he was placed in his home unit and watched him ambulate by holding on to tables. (*Id*.).

Plaintiff alleges that from October 1, 2015 through the filing of his Complaint Defendants Hart and Robinson caused him to suffer additional injury to his femur and pelvis. (*Id*. at 10). Defendant Robinson "whited-out" his hip complaints on his sick calls and inmate request forms and denied him access to Defendant Vowell. (*Id*.). Defendant Hart repeatedly denied him access to Defendant Vowell. Defendant Hart also continued to mislead Plaintiff by telling him his pain medication would be adjusted for better pain control, but then she denied the promised adjustments. Hart also repeatedly mislead him concerning appointments with an orthopedic surgeon. (*Id*. at 6-7, 11).

Plaintiff alleges that in November of 2016, Dr. Vowell continued to ignore his repeated requests for "pain control via alternate medications" and was unavailable for any direct meetings with Plaintiff. (*Id*. at 8).

Plaintiff proceeds against all Defendants in their official and personal capacity. (*Id*. at 4-11). He seeks compensatory and punitive damages. (*Id*. at 12).

---

[3] Plaintiff alleges he suffered an injury to his left hip on August 31, 2009, which required screws and pins for repair, and left him with a "small but notable limp." (ECF No. 6 at 2).
[4] Based on Plaintiff's incarceration records, it appears that WCSO is the Washington County Sheriff's Office.

Defendants filed their Motion for Summary Judgment on September 14, 2018. (ECF Nos. 21, 22, 23). After seeking and receiving a deadline extension (ECF Nos. 25, 26), Plaintiff filed his Response on November 9, 2018. (ECF Nos. 27, 28, 29, 30).

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  ANALYSIS

All four Defendants first note that Defendants Morgan and Robinson should be dismissed as parties to this case based on Plaintiff's deposition testimony that he intended to dismiss them.[5] They then argue summary judgment is appropriate in their favor because: (1) Plaintiff failed to exhaust any grievances for any of his claims with the sole exception of one grievance initiated against Defendant Hart on June 29, 2017, related to pain medication and a referral to an orthopedic surgeon; and (2) Defendant Hart provided conservative and appropriate treatment for Plaintiff's chronic hip pain.  (ECF No. 22 at 1-2).

Plaintiff labelled his Response documents with only Vowell and Hart as Defendants. Plaintiff admits he only exhausted one grievance concerning his claims in this case.  (ECF Nos. 27 at 1-2; 28 at 2).  He argues, however, that although this grievance only named Hart, it was meant to be against all Correct Care Solutions ("CCS") staff.  (ECF No. 30 at 1).  He further states he filed many grievances related to pain medication problems, failure to provide an ambulation device, and failure to provide proper medical care.  (ECF Nos. 27 at 1-2; 28 at 2).  He states they were not exhausted because he:

> was either talked out of continuing on with because promises were made to correct the issues or threats were made to move from SND Barracks if grievances were not dropped and others the grievances were forgotten about or time lapsed or untimely. However 1 grievance was filed and exhausted.

(ECF No. 28 at 2).  Plaintiff provided an eighteen-page "running flow log" describing his attached exhibits of grievance forms, inmate request forms, and other documentation.  (ECF No. 27 at 4-22).

---

[5] During Plaintiff's deposition he testified that he intended to dismiss Defendants Morgan and Robinson from his Complaint.  (ECF No. 23-5 at 3-5).  To date, no motion or request to dismiss Defendants Morgan and Robinson has been filed by Plaintiff.

4

Plaintiff states he is a former registered nurse[6] and can provide his own professional judgment in this case. (ECF No. 28 at 5). He argues that the pain treatment given to him in the ADC was not effective, and Defendant Hart's medical records notes indicating that the meloxicam and nortriptyline were helping his pain were "an outright fabrication in creative charting on Ms. Hart's part." (ECF No. 30 at 4). He "never stated that the pain was controlled with nortriptyline at all EVER." (ECF No. 30 at 6). He further states he was "never prescribed any prescription strength pain killers." (ECF No. 29 at 11). Plaintiff acknowledged that he has had problems with "heavy drugs" in the past,[7] and therefore did not ask for narcotic pain relief at the ADC. (ECF No. 29 at 6). He asks the Court to note that inmates are forced to use the sick call forms because the inmate's signature on the form is proof that he or she agrees to pay for the services. Plaintiff alleges this forces ADC inmates, who are not paid for their work at the ADC, to pay for their own healthcare.[8] (ECF No. 27 at 14). Plaintiff alleges he has paid for sick calls but has not received "meaningful treatment" or "effective pain control." (ECF No. 27 at 21).

### A. Defendants Vowell, Morgan and Robinson[9]

Plaintiff failed to exhaust any administrative remedies against Defendants Vowell, Morgan and Robinson. The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law,

---

[6] Plaintiff provides no evidence to support this statement.
[7] In an Inmate Request Form dated March 24, 2016, Plaintiff noted he has taken 20 mg of "Oxy" eight times per day in the past. (ECF No. 27-2 at 14).
[8] Requiring a patient to pay for medical care does not state a claim of constitutional dimension. While jails must provide basic medical care to inmates, there is no requirement that the jails provide the medical care free of cost. *See, e.g., Reynolds v. Wagner*, 128 F.3d 166, 173-74 (3rd Cir. 1997) (deliberate-indifference standard does not guarantee prisoners right to be entirely free from cost considerations that figure in medical-care decisions made by most non-prisoners in society). Inmates may be constitutionally required to pay for their own medical expenses, if they can afford to do so. *Roberson v. Bradshaw*, 198 F.3d 645 (8th Cir. 1999); *cf. Jensen v. Klecker*, 648 F.2d 1179, 1183 (8th Cir. 1981) (no basis for due process claim where deductions from prisoner accounts were assessments for value received).
[9] Defendants only applied this argument to Defendant Vowell in their brief due to Plaintiff's deposition testimony. Upon review of the summary judgment record, however, it is clear that the argument is equally applicable to Defendants Morgan and Robinson.

by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal quotation marks and citation omitted). The "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*. A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012).

There is no dispute that Plaintiff exhausted only one grievance concerning his claims: OR-OR-17-01092. The Step Two formal grievance was submitted on June 29, 2017. (ECF No. 23-1 at 22). It names Defendant Hart but makes no mention of Defendants Vowell, Morgan, or Robinson. Plaintiff argues that the grievance was intended to be against all CCS staff. (ECF No. 30 at 1-2). ADC Administrative Directive 14-16, paragraph IV(C)(4) requires inmates to "specifically name each individual involved" in their grievance. (ECF No. 23-1 at 6). As such, Plaintiff's argument that OR-17-01092 should qualify as a blanket accusation against all CCS staff is without merit because he did not comply with the prison's grievance requirements.

Plaintiff also argues that he filed many grievances and did not exhaust them because he was talked out of doing so, threatened, or there were timing issues which prevented him from doing so. Plaintiff provided copies of four other grievances at various stages of the ADC grievance process in support of this argument.[10] None of these grievances name Defendants Vowell,

---

[10] Plaintiff submitted three Informal Unit Level Grievances on March 30, 2016. These grievances reference only "Ms. Bailey" by name. Both grievances also state that he does not want to be charged for a sick call. (ECF No. 27-

6

Morgan, or Robinson.  (ECF No. 27-2 at 8-10, 22, 26).  Thus, even if Plaintiff was somehow maneuvered out of completing the grievance process for these four grievances, his argument is again without merit in relation to these Defendants because they were not named as required by the ADC grievance requirements.

Because Plaintiff failed to exhaust his administrative remedies against Defendant Vowell, Morgan, and Robinson they are entitled to summary judgment as a matter of law.

### B. Defendant Hart

This leaves Plaintiff's sole exhausted grievance for this case: OR-17-01092.  Plaintiff submitted this as a formal grievance on June 29, 2017.  (ECF No. 23-1 at 22; 27-2 at 42).  It states Defendant Hart has repeatedly lied to Plaintiff about giving him some pain relief, refuses to help him with his pain, and refuses to refer him to an orthopedic specialist for evaluation. (*Id*.).[11]  There is no dispute in the record that Plaintiff had suffered a serious injury to his hip prior to his incarceration in the ADC.  Plaintiff provided copies of a CT scan at Baptist Health on December 6, 2016, noting he had "complete erosion of the femoral head and the majority of the femoral neck."  Plates and screws were noted to be in place.  (ECF No. 27-3 at 2).  Based on the summary judgment record it is clear Plaintiff suffered from an objectively serious medical condition.  The question is whether he was denied adequate pain control or other medical care for his hip. Defendants argue he merely disagrees with the treatment received.  (ECF No. 22 at 9-10).

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs.  *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th

---

2 at 8-10).  Plaintiff submitted Formal Grievance OR-17-00024 on January 5, 2017.  (ECF No. 27-2 at 22).  This grievance does not mention any personnel by name, instead charging that "the medical staff" discontinued his pain pills.  (*Id*.).

[11] Plaintiff therefore failed to exhaust any administrative remedies against Defendant Hart for his claims concerning any ambulatory devices.

7

Cir. 2012). To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) (citation omitted). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id*.

It is well settled that "[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (internal citation omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.* (internal citations omitted). Despite this, issues of fact exist when there is a question of whether or not

medical staff exercised independent medical judgment, and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05. However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis[,]'" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub,* 638 F.3d at 919 (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir. 1995); *cf. Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

As stated above, there is no dispute that Plaintiff meets the objective first prong of the deliberate indifference standard, namely, he suffered from an objectively serious medical need or condition. A review of the records for this case, however, indicates he failed to meet the subjective second prong of the standard.

### 1. Defendants' Records

The following information is taken from Plaintiff's medical records, provided by the Defendants as part of the summary judgment record. Plaintiff was seen for intake at the ADC on October 6, 2015. (ECF No. 23-2 at 3). It was noted that Plaintiff's leg was about one inch shorter

than his right due to surgery to the left hip and femur in 2009. Plaintiff was noted to have a slow, limping gait and he was unable to fully squat. (*Id*.). Plaintiff reported his current medications as amitriptyline 50 mg, meloxicam 15 mg, gabapentin 300 mg, and antacids for GERD. (*Id*. at 1). As he was not able to have his gabapentin refilled in intake, Plaintiff requested Tylenol to replace the gabapentin. (*Id*. at 6). He was prescribed 500 mg Tylenol, meloxicam 15 mg, and Ranitidine 150 mg. (*Id*.).

In September and October of 2016, Plaintiff was hospitalized with c-diff and sepsis related to a severe gastrointestinal infection. (ECF No. 23 at 5). When he was returned to the ADC unit under the care of Dr. Liggett in the infirmary ward, he was prescribed nortriptyline 50 mg in place of the amitriptyline 50 mg. (ECF No. 23 at 5).

Plaintiff saw Defendant Hart for a sick call on December 16, 2016, with the complaint of hip pain. He wanted his amitriptyline renewed, stating nortriptyline does not work. He also complained of blood in his stool and other issues. Hart increased his dosage of nortriptyline from 50 mg to 75 mg and indicated CCS staff would contact Baptist Health for Plaintiff's medical records there, including his CT scan of his hip. (ECF No. 23-2 at 15-16).

Plaintiff was seen by Nurse Gifford on February 6, 2017, for a sick call. At this sick call Plaintiff requested that his Tylenol, meloxicam, and Elavil/amitriptyline be restarted and his nortriptyline dosage be kept at 150 mg. His current medications were continued. (ECF No. 23-2 at 20).

In mid-February 2017, Dr. Vowell prescribed an additional morning 25 mg dose of nortryptaline in addition to the 75 mg evening dose. (ECF No. 23 at 6).

Defendant Vowell provided an affidavit that Plaintiff was inadvertently given a double dose (150 mg) of nortriptyline in the evening from February 9 through February 15, 2017. When

10

Plaintiff requested that the 150 mg be renewed, she initially entered the request, but then caught the error and corrected it back to the 75 mg evening dose. She also inadvertently prescribed an additional 25 mg dose in the evening, which was intended for his morning dose. This error was corrected on February 21, 2017. (ECF No. 23-4 at 2, n. 1). Defendant Vowell left the day clinic shortly thereafter, so Plaintiff was under the care of Defendant Hart, Dr. Daniel, and Ms, Cannon. (ECF No 23 at 6).

On March 8, 2017, Plaintiff was seen at a sick call by Defendant Hart for his hip pain. Plaintiff wanted to know why his nortriptyline had been decreased and wanted his meloxicam prescription renewed. Hart added a 15 mg meloxicam prescription at Plaintiff's request. (ECF No. 23 at 6; 23-2 at 26). She explained to Plaintiff that he needed to try the lower 75 mg nortriptyline dosage for his own safety, as he needed to be on the lowest possible dose to minimize any of the side effects associated with nortriptyline. She wrote that Plaintiff agreed to try this new dose. (ECF No. 23-2 at 26).

Plaintiff was seen in the clinic on April 9, 2017, after another inmate punched him in the face. Plaintiff's wounds were treated and he was given a one-time dose of ibuprofen. Notes indicated he was only to get one dose of ibuprofen due to his history of gastrointestinal tract bleeds. No discussion of hip pain was noted. (ECF No. 23-2 at 28)

Plaintiff was seen in the clinic on April 18, 2017, for a lab test. There were no notations concerning his hip pain. (ECF No. 23-2 at 29).

Defendant Hart had two chronic care appointments with Plaintiff on April 17, 2017, and June 15, 2017. In April, Plaintiff was noted to be taking the following pain medications: meloxicam 15 mg, nortriptyline 75 mg and 25 mg, and venlafaxine 75 mg. A notation indicated Plaintiff reported the nortriptyline as helpful. (ECF No. 23-2 at 31). Assessment notes listed his

hip as painful but controlled with nortriptyline. (ECF 23-2 at 32). On June 15, 2017, the same pain medications were noted. Plaintiff's CT scan from Baptist Health was also noted as showing erosive changes in the hip. Plaintiff indicated his hip bothered him "all the time," but the nortriptyline helped. Hart assessed his chronic hip pain as stable on nortriptyline and meloxicam. Plaintiff requested to see a specialist for his hip, but Hart's decision was to monitor him for three months. He was instructed to submit a sick call for any daily issues. (ECF No. 23-2 at 37-38).

Ms. Cannon conducted the next chronic care appointment on September 2017. (ECF No. 23-2 at 41). In Defendant Vowell's professional opinion, Defendant Hart's treatment of Plaintiff was both conservative and appropriate. (ECF No. 23 at 7; 23-4 at 3).

### 2. Plaintiff's Records

A review of Plaintiff's exhibits concerning his pain medication indicates he submitted an Inmate Request Form ("IRF") asking that his meloxicam be increased to three times per day and he be put back on his gabapentin on December 30, 2015. He was informed by Defendant Vowell that meloxicam could only be taken twice a day and nortriptyline had been added. (ECF No. 27-2 at 4). On March 30, 2016, Plaintiff submitted a grievance request to be placed back on what he was taking at the county jail before he came to the ADC. The response asked him to follow the sick call procedure if he needed medical attention. (ECF No. 27-2 at 9). On March 24, 2016, Plaintiff submitted an IRF requesting that he be given the Tylenol and have his Elavil/ amitriptyline increased to 100 mg. Defendant Vowell responded that this was addressed. (ECF No. 27-2 at 14). On November 16, 2016, Plaintiff submitted an IRF noting his medication had been reduced after his hospitalization, and requested meloxicam, Elavil/ amitriptyline and ibuprofen. He was directed to place a sick call if he needed help with his symptoms. (ECF No. 27-2 at 16).

On November 21, 2016, Plaintiff submitted two IRFs, noting his November 16, 2016, request and asking why he had to submit a sick call and be charged for it when he wanted

medication restarted. The response noted that the medical provider had discontinued Elavil and had not approved renewal of the Meloxicam. (ECF No. 27-2 at 19-20). He also stated UAMS physicians told him he needed surgery to repair his hip. Plaintiff wanted a consult with a surgeon to determine the date for the surgery. (ECF No. 27-2 at 20). He was instructed to submit a sick call for both IRFs. Plaintiff did not provide any UAMS hospital records indicating he needed surgery.

On December 27, 2016, Plaintiff submitted an IRF requesting that the Elavil/ amitriptyline that was stopped when he was hospitalized for c-diff be restarted and Tylenol 500 mg be added. the response indicated he was started on nortriptyline on December 28, 2016, and there were no notes from the medical provider to start Tylenol. (ECF No. 27-2 at 24).

On January 6, 2016, Plaintiff submitted formal grievance OR-17-00024 stating that the "medical staff" had stopped all of his pain medication after his hospitalization. He wanted his Elavil/amitriptyline re-started. He states his pain had been treated "as it should be" when he was hospitalized at UAMS and Baptist Health. The response indicated he had been prescribed nortriptyline and venlafaxine for pain, and this had been discussed with him on December 16, 2016, during an examination. He was told to submit a sick call if his pain continued. (ECF No. 27-2 at 22). Plaintiff did not identify the pain medication given to him in the hospitals or provide any medical records indicating how he was treated for pain at either hospital.

On February 1, 2017, Plaintiff submitted two IRFs. In one he stated he was receiving no viable pain treatment. He was referred to the response for OR-17-00024. (ECF No. 27-2 at 28). In the second he requested pain treatment and noted the hospital treated his pain and provided a CT scan showing the source of the pain. This was noted to be a duplicate statement and Plaintiff was told he was free to review his medical records. (ECF No. 27-2 at 29).

On February 4, 2017, Plaintiff submitted an IRF again asking for the meloxicam, Tylenol, and Elavil/amitriptyline combination he had been given at the county jail. The response noted he was currently scheduled for a sick call on the issue of pelvic pain. (ECF No. 27-2 at 32).

Between February 1, 2017 through March 10, 2017, there are numerous IRFs concerning the 150 mg dosage of nortriptyline and Plaintiff's request that it be continued because it "worked better" and took "some edge off" his pain. (ECF No. 27-2 at 30, 32, 34, 36, 37, 38, 39, 40). The last IRF was dated March 10, 2017, and the response noted that Plaintiff had been seen for this issue on March 8, 2017, and had agreed to the plan of care discussed with provider. (ECF No. 27-2 at 40).

The next IRF was submitted on June 27, 2017. (ECF No. 27 at 18; 27-2 at 41). Plaintiff stated he saw Defendant Hart in the past 30 days and was told she would increase his evening nortriptyline dose to 100 mg and his morning dose to 50 mg. and would give him Tylenol. Plaintiff was directed to submit a sick call, as there was no documentation of any medication increases. (ECF No. 27-2 at 41). Plaintiff submitted OR- 17-01092 at the informal level on June 28 and the formal grievance on June 29, 2017. (ECF No. 27-2 at 42).

### 3. Analysis

In summary, the record shows that after Plaintiff returned from his hospitalization at Baptist Health for a severe gastrointestinal infection, adjustments were made to Plaintiff's pain medication during sick calls in December 2016, as well as February and March of 2017. In December the dosage of nortriptyline was increased from 50 mg to 75 mg. In February, a 25 mg morning dose of nortriptyline was added. In a March sick call with Defendant Hart, meloxicam was added at Plaintiff's request.

Plaintiff was then seen for chronic care appointments in April and June by Defendant Hart. Charting notes for April indicate Plaintiff stated the nortriptyline was helpful in controlling his hip

pain. No changes were made to his medications, which included 75 mg of nortriptyline in the evening, 25 mg of nortriptyline in the morning, and 15 mg of meloxicam. Notes for his June 15, 2017, appointment indicated the nortriptyline and meloxicam helped, but his hip bothered him. He requested an examination by a specialist. The decision was made to monitor him for three months, and Plaintiff was instructed to place a sick call for any daily issues.

Plaintiff disputes that he ever stated that the nortriptyline helped with his pain and accuses Defendant Hart of entering false information on his charts. Plaintiff's own documentation, however, including his "running flow log," contradicts his allegations of false charting. The charting notes in question were made during his chronic care appointments with Defendant Hart on April 17, 2017, and June 15, 2017. Despite submitting numerous IRFs prior to March 10, 2017, and starting up again on June 27, 2017, Plaintiff did not submit any sick calls or IRFs between the date of his March appointment with Defendant Hart and the end of June, when he filed his grievance OR-17-01092. (ECF No. 27 at 17-18). His allegations that he was suffering from uncontrolled pain during this period and that Defendant Hart falsified his medical charts regarding that pain is therefore contradicted by the record.

Prior to March, Plaintiff had submitted a number of IRFs complaining about his pain medication and was repeatedly told to submit a sick call for medical issues.[12] He was therefore well-aware of the sick call process. In his Response, he stated he chose not to use the sick call process because he did not want to pay the co-pay or any other charges for a sick call, thereby complicating his medical treatment by refusing to follow the ADC sick call process. I also note that although Plaintiff stated his hip pain was properly treated while he was hospitalized, he failed to describe that pain treatment. Nor did he provide copies of his medical records from any hospital

---

[12] *See Kulow v. Nix*, 28 F.3d 855, 859 (8th Cir. 1994) ("if any claim of medical indifference . . . is to succeed, it must be brought against the individual directly responsible for [Plaintiff's] medical care.")

to document the pain regimen that allegedly worked during his time there, even though he clearly had access to those records. Instead, he provided only the CT scan evaluation of his hip from Baptist Health. Vague and conclusory statements that other medical providers were able to successfully manage his pain are insufficient to raise a question of material fact concerning the medical care provided for his hip by Defendants. *See McLanahan*, 2016 WL 520983, at *6 (citing *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015). ("Conclusory, non-specific statements in an affidavit or verified complaint" are insufficient to survive summary judgment.).

Thus, the record before the Court shows frequent adjustments and additions to Plaintiff's pain medication when he placed sick calls to be seen by medical staff who could make prescription modifications, regular appointments with health care professionals for both sick calls and chronic care appointments, charting notes in which he reported his chronic pain was being helped, and hospitalization in a free-world facility on two occasions for severe gastrointestinal issues. Further, he has not provided any objective medical evidence that he should be receiving any alternative pain medications or treatments for his hip. His allegations that he was denied medical care and pain medication for his hip are therefore contradicted by the record. Plaintiff's mere disagreement with his pain medication prescriptions or with the decision to monitor him further before referring him to a specialist does not rise to the level of a constitutional violation. *See Nelson,* 603 F.3d at 449) (It is well settled that "[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation.").

There are no genuine issues of material fact and Defendant Hart is entitled to summary judgment as a matter of law.

### IV. CONCLUSION

Accordingly, I recommend that Defendants' Motion for Summary Judgment (ECF No. 21) be GRANTED and all Plaintiff's claims be DISMISSED WITH PREJUDICE.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of June 2019.

/s/ *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE